

# NUMBER 13-09-00516-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**MOHICAN OIL & GAS, LLC,**                       **Appellant,**

**v.**

**SCORPION EXPLORATION & PRODUCTION,
INC. AND CHAPCO, INC.,**                 **Appellees.**

---

### On appeal from the 319th District Court
### of Nueces County, Texas.

---

# OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Opinion by Justice Rodriguez

This is an appeal from a jury trial on disputes over an oil and gas drilling contract. By one issue, appellant Mohican Oil & Gas, LLC, plaintiff and counter-defendant in the trial court, challenges as legally and factually insufficient the evidence supporting the jury's award of damages and attorneys' fees to appellee Chapco, Inc., defendant and

counter-plaintiff in the trial court.  By one issue, cross-appellant Scorpion Exploration &

Production, Inc., defendant and counter-plaintiff in the trial court, argues that the trial

court erred in awarding attorneys' fees to cross-appellee Mohican and not Scorpion

because Scorpion, not Mohican, was the prevailing party in the contract litigation.  We

affirm, in part, reverse and render, in part, and reverse and remand, in part.

## I. BACKGROUND

Mohican is an oil and gas exploration and development company.  Scorpion is a

drilling contracting company, and Chapco is a well operating company; both are owned

and run by Lauro Chapa.  In the fall of 2006, Mohican and Scorpion entered into a

turnkey contract[1] for the drilling of Olmitos No. 2, a directional oil and gas well[2] in Webb

County, Texas.  Under the contract, Mohican, as operator, agreed to pay Scorpion, as

drilling contractor, a lump sum of $1.158 million to drill the well.  The parties agreed that

Chapco, Chapa's other company, would be the listed with the Texas Railroad

Commission (TRC) as the operator of Olmitos No. 2.

Drilling commenced on Olmitos No. 2 on November 21, 2006.  Throughout

December 2006, Scorpion encountered several difficulties in setting the intermediate

---

[1] According to undisputed testimony at trial, a "turnkey" drilling contract is one in which the drilling contractor assumes all control and responsibility for drilling the well to a set depth.  Under a turnkey contract, the drilling contractor is paid a lump sum that typically includes a profitable premium; the contractor is then responsible for coordinating with the subcontractors and other entities involved in the drilling and compensating those entities.  In contrast, when a contract is performed on a "daywork" basis, the contract operator directs and coordinates all operations on the well and is therefore responsible for all costs and occurrences associated with drilling the well to the set depth.

[2] Testimony at trial established that a directional well is one that deviates the wellbore—i.e., the drilled hole—along a planned path to a target located a preset lateral distance and direction from the vertical.  *See also* Schlumberger Oilfield Glossary: Directional Well, http://www.glossary.oilfield.slb.com (last visited Dec. 29, 2010) (defining a directional well as "[a] wellbore that requires the use of special tools or techniques to ensure that the wellbore path hits a particular subsurface target, typically located away from (as opposed to directly under) the surface location of the well").

casing and proceeding to production depths,[3] including premature flowing and the wellbore falling in on itself.[4] The difficulties were eventually resolved, and the well reached its total depth on January 15, 2007.

Mohican paid Scorpion the first half of the lump sum contract price up front and the second half when the well reached its total depth. In February 2007, Scorpion demanded approximately $836,000 from Mohican in addition to the lump sum contract price, claiming that the contract converted to daywork basis when the drilling complications began in early December 2006.[5] Mohican refused to pay the additional sum, and Chapco refused to turn over operatorship of Olmitos No. 2 until Mohican did so.[6]

In March 2007, Mohican filed a petition for declaratory judgment against Scorpion and Chapco.[7] In its petition, Mohican also alleged breach of contract,[8] fraud, fraud in

---

[3] According to testimony at trial, casing is heavy pipe used to seal off drilling fluids from the wellbore and/or to keep a cave-in from occurring in the wellbore. The Olmitos No. 2 was to be drilled with three stages of casing: surface, intermediate, and production. First, the surface casing would be put in place; the surface casing conducts the drilling mud or fluid through the loose formation or soil near the surface of the well. Next, the intermediate casing would be set below the surface casing. The intermediate casing protects the formation at that depth and serves as the jump-off to the directional part of the well and production casing. The production casing then conducts the produced hydrocarbons to the surface.

[4] At trial, the parties disputed the cause of the premature flowing of the well. Mohican contended that Scorpion failed to use the proper mud weight to keep the pressure balanced in the well. Scorpion contended that Mohican's failure to provide certain services under the contract left Scorpion without the necessary information to monitor the well, and the flowing and resulting delay was caused by unanticipated problems in the formation. *See infra* note 10 and accompanying text discussing mudloggers.

[5] Scorpion claimed that Mohican altered the turnkey contract by changing the intermediate casing depth after drilling had already begun.

[6] Mohican obtained an administrative transfer of operatorship from the Texas Railroad Commission in July 2007.

[7] Mohican sought declarations from the trial court as follows:

a)    Declare that the drilling of [Olmitos No. 2] was under the terms of a Turnkey contract;

b)    Declare that under the Contract, [Scorpion was] required to notify [Mohican] in writing of any change from Turnkey to daywork and/or vice versa;

3

the inducement, and sought a verified accounting. Scorpion and Chapco then filed counterclaims to Mohican's suit. Scorpion alleged breach of contract,[9] fraud, and quantum meruit, in connection with Mohican's refusal to pay the additional $836,000 and other claimed wrongs under the contract, and requested judicial foreclosure on its mechanic's lien on Olmitos No. 2 and an assigned claim Scorpion purchased from a Mohican creditor. Chapco alleged breach of contract and quantum meruit, claiming that Mohican refused to pay Chapco for its services as the TRC-listed operator.

In May 2009, Mohican's claims and Scorpion and Chapco's counterclaims were tried to a jury. At trial, the following facts, relevant to this appeal, were in dispute: (1) whether the contract converted from turnkey to daywork when Scorpion encountered certain problems in the drilling process; (2) whether Mohican was obligated under the contract to provide Scorpion with a mudlogger[10] to assist Scorpion in the drilling of the

c)    Declare that [Scorpion] did not notify [Mohican] in writing of any change from Turnkey to daywork and/or vice versa;

d)    Declare that [Scorpion is] responsible for payment to vendors and service companies it hired to provide materials, goods or services at the well site;

e)    Declare that [Scorpion is] not owed any amount under a daywork rate; and

f)    Declare that [Scorpion is] responsible for removing any liens placed on the lease by vendors and/or service providers and other subcontractors for non-payment of services.

[8] Mohican alleged that Scorpion breached the contract by "failing to provide good and workmanlike equipment, including a triplex mud pump, for the drilling of the well which caused numerous delays."

[9] Scorpion alleged that Mohican breached the drilling contract by failing to provide a mudlogger or, alternatively, by failing to pay the amount due on the contract as a result of the contract converting from turnkey to daywork. *See infra* note 10 and accompanying text discussing mudloggers.

[10] According to testimony at trial, when drilling a well, the contractor uses a circulating system of mud, or drilling fluid, to facilitate the movement of the drill bit through the earth and regulate the pressure in the hole. At trial, testimony established that a mudlogger is a person or entity that samples and analyzes cuttings from the well's mud system to help determine the nature of the layer where the well is at any certain point, i.e., whether the well is in sand or shale and whether there are hydrocarbons present in that layer.

At trial, the parties disputed the exact benefit and function of a mudlogger. Mohican contended that mudloggers are mainly useful to company geologists when the composition of the formation under the drilling site is uncertain; Mohican posited that the area in which Olmitos No. 2 was drilled was

well[11]; (3) whether the absence of a mudlogger caused delays that were attributable to Mohican and caused Scorpion damages; and (4) whether Chapco performed any compensable functions as TRC-listed operator.

At the close of evidence, the trial court granted Scorpion's motion for directed verdict on all of Mohican's claims except its claim for declaratory relief.[12]  Mohican stipulated at trial that it had an oral agreement with Chapco to serve as the TRC-listed operator for Olmitos No. 2.   There was, therefore, no liability question submitted to the jury on Chapco's breach of contract counterclaim; in this regard, the jury was only questioned on the amount of damages Chapco proved up.   The trial court thus submitted to the jury questions on:   Mohican's request for declaratory relief[13]; Scorpion's breach of contract[14] and fraud counterclaims; and the relevant damages at issue.[15]

---

well-documented and that its geologist therefore did not need a mudlogger.  Scorpion contended that mudloggers are also useful to the drilling contractor because a mudlogger's analysis of the cuttings aids the contractor in determining whether they are drilling into a layer that requires certain additional precautions in its operations.

[11] It was established at trial that the drilling contract for Olmitos No. 2 mirrored the contract for an earlier well (Olmitos No. 1) drilled by Scorpion for Mohican in the same vicinity.  Under both contracts, Mohican agreed to provide a mudlogger when the well reached a depth of 5,500 feet.   It is undisputed that Mohican provided a mudlogger during the drilling of Olmitos No. 1 but not during the drilling of Olmitos No. 2.

[12] Mohican does not challenge the directed verdict on appeal.

[13] The three declaratory relief questions submitted to the jury were as follows:   (1) "Did Scorpion and Mohican agree that Scorpion would provide written notification to Mohican of any change from Turnkey to Daywork?"; (2) "Did Scorpion fail to comply with the contractual agreement to provide written notification to Mohican of a change from Turnkey to Daywork?"; and (3) "Is there a requirement under the contract on Olmitos No. 2 to provide written notification of a change from Turnkey to Daywork before recovering for work performed on a Daywork basis?"

[14] The breach of contract question to the jury was as follows:   "Did Mohican fail to comply with the drilling contract?"

[15] With regard to the damages associated with Scorpion's breach of contract action against Mohican, the jury was asked:

What sum of money, if any, if paid now in cash would fairly and reasonably compensate Scorpion for its damages, if any, that resulted from [Mohican's] failure to comply?

Consider the following elements of damages, if any, and none other[:]

5

In its verdict, the jury answered "yes" to Mohican's declaratory relief questions. The jury also found that Mohican had breached the drilling agreement with Scorpion but that the breach was not material and that Mohican had not committed fraud against Scorpion. In response to the damages questions, the jury awarded $139,120 in damages to Scorpion and $60,000 in damages to Chapco. After the jury's verdict, the attorneys for all parties submitted affidavits to the trial court attesting to their fees and expenses in litigating the parties' claims and counterclaims.[16]

In its judgment, the trial court found that: (1) Mohican had established its entitlement to declaratory relief[17]; (2) Scorpion had established its breach of contract claim against Mohican and should be awarded $139,120[18]; and (3) Chapco should be

---

The additional time and expenses incurred by Scorpion as a result of any delays attributable to Mohican's breach of contract.

With regard to the damages associated with Chapco's contract action against Mohican, the jury was asked:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Chapco for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other[:]

. . . .

The time spent by Chapco as operator of the Olmitos No. 2 well.

[16] The parties agreed that the issue of attorneys' fees would not be submitted to the jury, instead agreeing that they would file affidavits of their fees and expenses with the court after trial. No objections were made to the fees affidavits, and they are not challenged on appeal.

[17] Specifically, the trial court found that Mohican had "established under its Declaratory Judgment Action the following:"

(A) That Scorpion agreed to provide written notification to Mohican of any change from Turnkey to Daywork basis;

(B) That Scorpion failed to comply with the contractual agreement to provide written notification to Mohican of any change of Turnkey to Daywork basis; and

(C) That Scorpion was required under the contractual agreement to provide written notification of a change from Turnkey to Daywork basis before recovering from [Mohican] for work performed on a Daywork basis.

[18] The judgment also awarded Scorpion $15,436 in prejudgment interest.

awarded $60,000 for Mohican's breach of their agreement.[19]   The trial court then found

that Mohican was the prevailing party in its case against Scorpion and should be awarded

attorneys' fees in the amount of $163,037.87.   The trial court also awarded Chapco

attorneys' fees in the amount of $72,146.89.   Chapco's total award from Mohican,

including prejudgment interest, was calculated to be $138,763.32.   After offsetting

Mohican's attorneys' fees award by the damages it owed to Scorpion, the trial court

concluded that Mohican should recover $8,481.87 from Scorpion.

After the trial court issued its judgment, Scorpion filed a motion to modify, correct,

or reform the judgment, arguing that the trial court erred in finding that Mohican was the

prevailing party in the litigation.   Mohican also filed a motion to disregard jury findings, for

judgment notwithstanding the verdict, to reform the judgment, or in the alternative for a

partial new trial or remittitur.   In its motion, Mohican sought, in relevant part, to set aside

the judgment in favor of Chapco or a new trial or remittitur on that claim because of

insufficient evidence of damages.[20]   The trial court denied both motions.[21]   This appeal

followed.

## II.  CHAPCO'S DAMAGES

By one issue, Mohican argues that there was legally and factually insufficient

evidence that Chapco suffered $60,000 in damages for "time spent by Chapco as

operator of the Olmitos No. 2 well."   Specifically, Mohican argues that the evidence

---

[19] The judgment also awarded Chapco $6,657.53 in prejudgment interest.

[20] In its post-judgment motion, Mohican also asked the trial court to:   disregard the jury's findings on Scorpion's breach of contract claim because the evidence did not support the charge and the jury's affirmative answers on Mohican's declaratory relief precluded recovery by Scorpion on breach of contract; or in the alternative, order a new trial because the evidence was insufficient to support the judgment in favor of Scorpion.   On appeal, however, Mohican does not challenge the jury's findings in favor of Scorpion.

[21] On appeal, neither party challenges the trial court's ruling on its post-trial motions.

7

showed that Chapco performed none of the essential functions of an operator and Chapco therefore failed to prove it suffered damages.

## A. Standard of Review

In determining whether there is legally sufficient evidence to support the finding under review, we consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

In reviewing an appellant's factual sufficiency challenge to an adverse jury finding on which the other party had the burden of proof, as is the case here, we will consider, weigh, and examine all of the evidence in the record, both in support of and contrary to the finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence

8

as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

## B. The Evidence

At trial, John Newman, co-owner of and landman for Mohican, testified that Mohican was the operator on the drilling contract and Chapco was listed as operator with the TRC. Newman testified that Mohican asked Chapco to be listed as the operator with TRC for competitive reasons; Mohican wished to avoid being publicly associated with the well. According to Newman, however, Chapco performed none of the functions of an operator, which include "permitting," "receiv[ing] revenues," "pay[ing] royalties," running daily oil and gas charts and gauging the well, and "administer[ing] the contracts." Newman testified that Mohican hired a company "to do the Railroad Commission permitting." Newman admitted that, as TRC-listed operator, Chapco was liable for certain contingencies such as waste and contamination and that if "there's a problem, [the operator] gets a phone call." Finally, Newman testified that the "highest [Mohican has] received" for acting as operator is $650 a month.

Chapa testified that he was seeking $65,000 for acting as operator. He testified that although he did not do any of the permitting with the TRC or perform any other operator functions, such as "send[ing] out reports" to working interest owners, "gather[ing] the revenue," "figur[ing] out who gets what," or "pay[ing the] taxes," he was "libel [sic] for everything" and "put [his] neck into it." As far as the amount of money he was owed, Chapa testified that $65,000 "sound[ed] fair to [him]."

Finally, Chapco called Robert Dougherty to testify as its expert witness on operations. Dougherty testified as follows regarding the responsibilities of the operator:

9

And then as the operator, you're in charge for the whole group. You are the one that puts the whole team together and focuses them in one direction. You're the one if any problem comes up, you're the one that they – whoever they are, come to. Either the EPA, land owners, offset operators. Anyone that may be upset or may have a complaint.

. . . .

When you sign on as an operator, you have to fill out a P5 – you give all your information to the State of Texas. Even down to your business address, your home address, and your driver's license. And everything builds upon there. All the information that you submit that has to do with meeting the requirements and laws of the State of Texas. Everything that pertains to information as far as surveys, legal requirements, you have to be responsible for submitting all that. And conducting your operations, when you're drilling, under the rules – drilling and producing under the rules of the Railroad Commission.

. . . .

When the well blows out, the first person they go to is the operator.

. . . .

Okay. Let's say that the well blows out and blows a landowner's cow off into space, the landowner is going to go to the operator of record for recourse to be – so he can be paid back for that cow.

Let's say that the mud goes and ruins the environment around there, right; kills the fish in a tank or runs into Nueces Bay and kills all this, the State of Texas comes to the operator. And he goes to Austin and picks up a phone and finds out even where that guy lives and they'll go knock on his door. So the operator is the one they come to first and has the ultimate responsibility.

Dougherty testified as follows about compensation for an operator, in general, and

for Chapco, in this case:

Now, when drilling a well, we charge $1,000 a day while drilling, okay? That includes my insurance, my staff, and my experience that I have in the industry and what I've learned through good times and bad times and – and then once the well is completed and on production, then we charge $1,000 a month for our services. Which includes reporting to the

10

Railroad Commission, making sure that all operations conform to the rules and regulations of the State of Texas.

. . . .

From my understanding, it was 58 days of drilling. . . . [At] $1,000 a day, [that would be] $58,000. . . . The base charge for being listed as the operator, carrying all the exposure is – the going rate is $1,000 per month. . . . "Three or four – if it had been six months, [that would be an additional] $6,000.

Dougherty then agreed that "approximately 64 to $65,000" would be "a reasonable charge by Chapco."

## C. Discussion

Mohican argues that Chapa conceded in his testimony that he performed none of the essential functions of an operator, as those functions were defined and explained by Dougherty and the other witnesses. Mohican also argues that Dougherty's expert testimony is no evidence of the damages because his testimony was based on the assumption that Chapa did perform those functions and was therefore baseless and conclusory. For these reasons, Mohican argues that Chapco failed to prove it suffered damages in the amount it was awarded.

Under the jury charge, Chapco was awarded $60,000 for "time spent . . . as operator of the Olmitos No. 2 well." Because Mohican did not object to the charge and does not challenge it on appeal, we conclude that is the relevant measure of damages for this issue. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (citing TEX. R. CIV. P. 272, 274, 278, 279; *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985); *Allen v. Am. Nat'l Ins. Co.*, 380 S.W.2d 604, 609 (Tex. 1964)) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the

11

opposing party fails to object to the charge."). And even presuming that Chapco performed only the one function to which Chapa testified,[22] i.e., assuming liability or "put[ting his] neck into it,"[23] we conclude there was sufficient evidence to support the

---

[22] We note that there was testimony that Chapa reviewed the daily drilling reports for the Olmitos No. 2. Mohican contends that Chapa was reviewing those reports in his function with Scorpion as the drilling contractor. Chapco responds that this distinction is immaterial and that this testimony proves Chapa did perform some of the duties of operator. We need not resolve this dispute, however, because our analysis depends solely on the fact that Chapco performed one particular operator function—assuming liability and responsibility in the eyes of the TRC.

[23] Mohican contends that under the drilling contract, Scorpion was liable for the first $1 million for damages from blowouts, contamination, and pollution, and Mohican was liable for any amount in excess of that. Under the drilling contract, Scorpion also released and indemnified Mohican from third-party claims. As a result, Mohican argues that, contrary to Chapa and Dougherty's assertions at trial, Chapco was not in fact liable or responsible for blowouts or other similar incidents should they have occurred on Olmitos No. 2. However, we disagree that Scorpion's contractual liability vitiates the regulatory liability assumed by Chapco by being listed as operator with the TRC. In this respect, we find the following testimony by Dougherty compelling:

| [Counsel for Chapco]: | Okay. Now there's been testimony in this case by Mohican that Chapco never did anything. In other words, as an operator; they were only listed as an operator. All right? Just trust me on that. All right. My question to you, though, is regardless of the fact whether they did anything in terms of looking at that report or that document, who does the Railroad Commission consider to be the operator and responsible for that well. |
|---|---|
| [Dougherty]: | Chapco, Incorporated. |
| | . . . . |
| [Dougherty]: | Well, I'm confused. Why would [Chapco] be operator of record [if it was not performing any of the functions]? |
| [Counsel for Mohican]: | Because apparently Mohican didn't want some competitors to know that they were drilling some offset wells. And so as a favor, Mr. Chapa said, "I don't mind putting my name on there." |
| [Dougherty]: | People in this business don't – that's like saying, "As a favor I will raise your child." Okay? |
| | . . . . |
| [Counsel for Mohican]: | Mr. Chapa, all he did – do you understand, Mr. Dougherty, all he did is he's got his name on a piece of paper and he assumed responsibility? |
| [Dougherty]: | Were you there? |
| [Counsel for Mohican]: | He just testified to that, okay? Assume for me that's what he testified to, "That's all I did. I put my name on a piece of paper and I assumed the responsibility." That's all he did. |
| [Dougherty]: | It's a pretty big job. |

We are therefore unpersuaded by Mohican's argument that its and Scorpion's contractual liability bears on the remaining liability of Chapco established at trial.

damages awarded by the jury.

In his testimony, Newman admitted that, because it was listed as operator with the TRC, Chapco was liable for potential problems such as waste and contamination. Chapa also testified that he would be liable for problems such as blowouts and dry holes. Dougherty testified that, when there are problems with a well, "the [TRC-listed] operator is the one they come to first and has the ultimate responsibility." Additionally, when questioned by Mohican's counsel regarding the "actual work" Chapco performed as operator, Dougherty responded, "First of all, it's the exposure. [Chapco] was exposed." Dougherty stated that, even if all Chapco did was put its "name on a piece of paper," "[i]t's a pretty big job."

With regard to the amount of compensation, we acknowledge that Chapa's statement that $65,000 was "fair" compensation for being the TRC-listed operator is, alone, not likely sufficient to support the jury's award. But the other evidence was more specific. Dougherty testified that he charged $1,000 a day while a well was being drilled and $1,000 a month after the well is completed and producing.[24] Newman, Mohican's landman, even provided a dollar amount; he testified that Mohican has been compensated up to $650 a month to serve as operator. The jury, therefore, had a range of rates to consider in making its determination. *See City of Keller*, 168 S.W.3d at 819

---

[24] On appeal, Mohican challenges Dougherty's expert testimony, contending that his opinions are no evidence because they are based on the erroneous assumption that Chapco performed all of the operator functions Dougherty enumerated in his testimony. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). We disagree that the dollar amounts to which Dougherty testified are based solely on those functions that Chapco did not perform. Rather, we think Dougherty clearly established in his testimony that the assumption of risk and liability is a key function of an operator, and Dougherty's criteria for his compensation amounts included "carrying all the exposure." Because that is the function on which we base our analysis here, we will not disregard this evidence.

13

(holding that jurors are the sole judges of credibility and evidentiary weight). And based on the evidence presented, the jury could have reasonably: credited Dougherty's testimony that there were "58 days of drilling"; awarded Chapco $1,000 for each of those days; determined that Chapco served as operator for two more months; and awarded it $1,000 for each of those months, which would total $60,000. We will not second-guess the jury's apparent decision to credit Dougherty's testimony over Newman's.

In sum, the testimony at trial established that Chapco assumed significant liability and responsibility by being listed as the operator of Olmitos No. 2 with the TRC. The compensation Mohican owed Chapco for assuming that responsibility was a matter within the jury's sound discretion, and there was evidence presented at trial that supported the jury's $60,000 award. Thus, viewing the evidence in the light most favorable to the jury's finding, we conclude that there was legally sufficient evidence that supported the jury's $60,000 award to Chapco for "time spent" as operator of Olmitos No. 2. Contrary to Mohican's assertions on appeal, the evidence did not conclusively establish that Chapco performed no essential functions of an operator; rather, there was more than a scintilla of evidence—or evidence from which reasonable jurors could differ in their conclusions—supporting the amount awarded to Chapco. *See id.* at 810, 827; *Rocor Int'l, Inc.*, 77 S.W.3d at 262. Moreover, considering both the evidence in support of and contrary to the finding, we cannot conclude that the amount of the award was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, so the evidence was also factually sufficient. *See Dow Chem. Co.,* 46 S.W.3d at 242;

14

*Cain*, 709 S.W.2d at 176.   Mohican's sole issue on appeal is overruled.[25]

### III.  PREVAILING PARTY AND ATTORNEYS' FEES

By one issue on cross-appeal, Scorpion challenges the trial court's award of attorneys' fees to Mohican, arguing that Scorpion, not Mohican, was the prevailing party in the dispute over the drilling contract because the jury found that Mohican breached the drilling contract and awarded Scorpion damages.

The trial court's judgment provides as follows regarding the prevailing party and attorneys' fees:

> It appeared to the Court that Mohican is the prevailing party in the litigation between it and Scorpion and is entitled to reasonable and necessary attorneys['] fees and costs under the drilling contract and the Texas Civil Practice and Remedies Code § 37.009 and § 38.001.   The Court finds that the amount of $163,037.87 is a reasonable and necessary fee in the trail [sic] of this matter, if the case is appealed and Mohican is the prevailing party on the appeal, an amount of $22,500.00 [i]s a reasonable and necessary fee, and in the event a petition of [sic] review is filed with the Texas Supreme Court, the amount of $22,500.00 is a reasonable and necessary attorneys['] fee.

The drilling contract provided as follows regarding attorneys' fees:

> If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

"Parties are free to contract for a fee-recovery standard either looser or stricter" than the fee-recovery standards provided by statute, and courts are bound by the parties' choice.   *Intercont'l Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex.

---

[25] In the event we reversed the jury's award to Chapco, Mohican also asked the Court to modify or eliminate the attorneys' fees awarded to Chapco.   Because we have affirmed the jury's damages to Chapco, however, we do not reach Mohican's arguments regarding attorneys' fees.   *See* TEX. R. APP. P. 47.1.

15

2009); *Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412, 417 (Tex. App.–Corpus Christi 2001, pet. denied) (citing *One Call Sys., Inc. v. Houston Lighting & Power Co.*, 936 S.W.2d 673, 676 (Tex. App.–Houston [14th Dist.] 1996, writ denied)). Because the contract at issue here provides for attorneys' fees, the terms of the contract, not statute, control the outcome of this issue. *See KB Home Lone Star L.P.*, 295 S.W.3d at 653; *Wayne*, 52 S.W.3d at 412.

When interpreting a contractual attorneys' fee provision in which the "prevailing party" term is left undefined, as is the case here, we are guided by the Texas Supreme Court's opinion in *Intercontinental Group Partnership v. KB Home Lone Star L.P.*. *See* 295 S.W.3d at 653-57. To begin, "we presume the parties intended the term's ordinary meaning." *Id.* at 653. In that regard,

> [t]o qualify as a prevailing party, a . . . plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff.

*Id.* at 654 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992)) (other quotations omitted). In short, "[w]hether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable," and the court then makes such an award. *Id.* at 655.

Here, in its original petition, Mohican prevailed upon the trial court to award it the equitable, declaratory relief related to the drilling contract it eventually obtained in the judgment. A complication arises, however, in that the judgment also concludes that Mohican committed a breach of the same contract against Scorpion. In light of these

16

seemingly competing conclusions in the judgment, the question remains: which party prevailed in the suit on the contract, Mohican or Scorpion? Our conclusion is that this is a case in which there were *two* prevailing parties at trial.

In drawing this conclusion, we are mindful of the supreme court's reasoning in *KB Home* with regard to declarations of rights that

> [V]indication is not always victory. However satisfying as a matter of principle, purely technical or de minimis success affords no actual relief on the merits that would materially alter [the plaintiff]'s relationship with [the defendant]. . . . [A] "nominal winner" in convincing the jury that it was "wronged," cannot be deemed a "prevailing party" in any non-Pyrrhic sense.

*Id.* at 656-57 (internal citations and quotations omitted). However, the supreme court's reasoning was predicated on the notion that the plaintiff in such a case sought only actual damages for breach of contract. *Id.* at 656 (stating that "to prevail in a suit that seeks only actual damages . . . there must be a showing that the plaintiff was actually harmed, not merely wronged"). In other words, the lawsuit in the supreme court's scenario was never one to "declare rights"; rather, this suit "always" sought only "money damages." *Id.* at 660-61.

Here, Mohican filed suit specifically to have its rights declared under the drilling contract. It sought equitable, declaratory relief separate and apart from its breach of contract claim—a claim that was not only disposed of on directed verdict but was not even related to the notice and turnkey versus daywork issues in the requested declaratory relief. By obtaining that declaratory relief in the trial court's judgment, Mohican therefore succeeded on the merits of its claim and affected the relationship between it and Scorpion. In other words, the declarations established that Scorpion could not recover from Mohican for any work performed on a daywork basis, and we conclude that Scorpion

17

thus prevailed in the controversy over the notice and turnkey versus daywork issue. The fact that Scorpion was also awarded damages on its counterclaim does not demote Mohican's declaratory relief to a mere "nominal," "technical[,] or de minimis" victory. To conclude otherwise would exalt monetary damages for a potentially unrelated counterclaim[26] over an equitable award that is equally valid in the eyes of the law. In Mohican's suit on the drilling contract—i.e., its request for declaratory relief—it was awarded the relief it sought from the trial court. It was a prevailing party.

Because we believe that Scorpion's counterclaim was also a suit on the drilling contract that was governed by the attorneys' fees provision therein, we further conclude that Scorpion was a prevailing party because it obtained a favorable answer to its breach of contract jury question and was awarded damages related to that breach. For the same reasons discussed above, we will not weigh the distinguishable successes achieved by both parties in order to determine that one is prevailing and one is not. Although tried before the same jury in the same proceeding, we believe there were essentially two suits brought on the drilling contract under different provisions of the contract and based on different actions by the parties during the drilling. Mohican prevailed in the controversy over the turnkey versus daywork issue. And even though the jury sided with Mohican on that issue, Scorpion nonetheless proved a breach of contract on its other pleaded theory for recovery. To interpret the jury's verdict in any

---

[26] The question submitted to the jury on Scorpion's counterclaim did not distinguish between the two unrelated theories for breach of contract advanced by Scorpion, one of which dealt with the turnkey versus daywork issue and the other of which dealt with the mudlogger issue. Neither were the questions submitted to the jury on Mohican's request for declaratory relief conditioned on an affirmative or negative answer to the breach of contract question or vice versa. By returning affirmative answers on Mohican's declaratory relief questions, we believe the jury resolved the turnkey versus daywork issue in Mohican's favor.

18

other way ignores the voluminous evidence and argument at trial regarding the mudlogger issue. As such, Scorpion was also a prevailing party in this litigation.

In drawing the foregoing conclusions, we feel compelled to address the parties' various arguments in support of their positions that they alone were the prevailing party. Scorpion argues that its breach of contract counterclaim rendered Mohican's "non-liability" declaratory judgment action moot and that Mohican cannot become a prevailing party by using its declaratory action to avoid the matured breach of contract claim. *See Shank, Irwin, Conant & Williamson v. Durant, Mankoff, Davis, Wolens & Francis*, 748 S.W.2d 494, 500 n.4 (Tex. App.–Dallas 1988, no writ).

First, we are not persuaded by the non-binding dicta holding in *Shank, Irwin* that Scorpion's contract counterclaim rendered Mohican's declaratory judgment action moot. In *Shank, Irwin*, the plaintiff filed a suit for declaratory judgment of non-liability on a contract for fees after the defendant had demanded payment for fees under that contract. 748 S.W.2d at 496. The defendant then filed a counterclaim seeking recovery of those fees it had demanded. *Id.* The trial court granted summary judgment in favor of the defendant on the counterclaim, but the court of appeals reversed holding that the plaintiff proved as a matter of law that it owed no fees under the contract. *Id.* at 497, 500. In a footnote, the court of appeals then declined to remand the case to the trial court for a determination of which party prevailed on the declaratory judgment action and was thus entitled to attorneys' fees, reasoning that once the defendant filed its counterclaim, the plaintiff's request for declaration of non-liability became moot. *Id.* at 500 n.4.

Here, the parties' claims were tried to a jury, not disposed of in pre-trial motions. Even if we were to assume that Mohican's declaratory action was somehow subsumed

19

into Scorpion's breach of contract counterclaim, that does not alter the fact that Mohican's declaratory judgment questions were submitted to the jury without objection by Scorpion. Further, Scorpion does not complain on appeal of any inconsistency in the jury's answers. We are therefore not persuaded that in this procedurally distinguishable situation, the pleading of a counterclaim by Scorpion—a counterclaim that, while arising out of the same contract as Mohican's declaratory action, is based partly on a different theory of recovery and different facts—should supplant the jury's clear answers on Mohican's declaratory action, answers that are challenged by no party on appeal.

Citing *MBM Financial Corp. v. The Woodlands Operating Co.*, Scorpion also argues that Mohican's declaratory judgment action was merely tacked onto Mohican's "matured contract and tort claims" and, as a result, could not be used as a vehicle to obtain attorneys' fees where Mohican failed to obtain damages and fees for its breach of contract action. *See* 292 S.W.3d 660, 670 (Tex. 2009). We disagree that this is a case in which a breach of contract action was "replead[ed] . . . as a declaratory judgment" and used as a "vehicle to obtain otherwise impermissible attorney's fees." *See id.* at 669. Mohican's original claim was one for declaratory relief. Although Mohican also alleged a breach of contract claim in that same petition, it was based on facts and actions unrelated to the subject-matter of its declaratory judgment action.[27] As a result, we do not believe that *The Woodlands* case governs under the facts of this case.

In support of Mohican's position that it, alone, was the prevailing party, Mohican argues that its declaratory judgment action was the main issue in the litigation and that, because it obtained favorable jury findings on its requests for declaratory relief, Mohican

---

[27] *See supra* note 8.

was the prevailing party at trial. In short, Mohican argues that its declaratory action was the "suit . . . brought on" the contract and that it prevailed in that suit. We disagree.

First, the supreme court has implicitly rejected the sort of "main issue" analysis that Mohican advocates in cases where a contractual attorneys' fee provision controls. *See KB Home*, 295 S.W.3d at 661-62. Second, concluding that the turnkey versus daywork controversy was the main issue in the litigation would be ignoring the evidence that was actually presented and argued at trial. Having reviewed the entire trial record, we believe that whether Mohican was obligated to provide a mudlogger to Scorpion during drilling and whether the delays and complications in drilling during December 2006 were the result of the failure to provide a mudlogger were issues of equal importance. We are therefore unpersuaded by Mohican's contention that it was the sole prevailing party because the main issue in the case was its declaratory judgment.

In sum, we conclude that the trial court erred in determining that Mohican was the sole prevailing party at trial. Both Mohican and Scorpion benefited from the relief awarded to them by the trial court in the judgment and thus prevailed on the merits of their claims. *See id.* at 654-55. Because of the unique character of this disposition, we do not believe that the attorneys' fees affidavits submitted by and stipulated to by the parties after trial are sufficient for this Court to render awards on appeal. Therefore, we will remand the issue of attorneys' fees for determination by the trial court. Scorpion's issue is sustained in so far as it complains that the trial court erred in denying Scorpion prevailing party status but overruled in so far as it complains that the trial court erred in ruling Mohican the prevailing party.

21

## IV. CONCLUSION

We affirm the judgment of the trial court regarding: (1) the damages awarded to Chapco, and (2) the prevailing party status conferred upon Mohican. We reverse the judgment of the trial court in so far as it denied prevailing party status to Scorpion and render judgment that Scorpion is a prevailing party in the litigation on the drilling contract. We further reverse and remand the case for determination of Mohican and Scorpion's attorneys' fees in accordance with this opinion.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 27th
day of January, 2011.

22